609 A.2d 1099 (1992)
Jose MITCHELL, Appellant,
v.
UNITED STATES, Appellee.
No. 89-CF-1373.
District of Columbia Court of Appeals.
Argued March 11, 1992.
Decided May 19, 1992.
*1100 Richard Greenlee, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.
Linda Otani McKinney, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Roy W. McLeese, III, Asst. U.S. Attys., were on the brief, for appellee.
Before ROGERS, Chief Judge, and SCHWELB and KING, Associate Judges.
ROGERS, Chief Judge:
Appellant Jose Mitchell appeals his conviction by a jury of first degree murder while armed, D.C.Code §§ 22-2401, -3202 (1989 Repl.), and carrying a pistol without a *1101 license, id. § 22-3202, on the ground of four claims of error. He contends that the trial judge erred by (1) denying a motion to order a psychiatric examination of a key government witness; (2) denying a motion to suppress the murder weapon; (3) admitting other crimes evidence of four handguns in and around the car in which appellant was arrested eight days after the murder; and (4) denying defense requests to instruct the jury on the use of prior consistent statements, perjurer's testimony, and accomplice testimony. Except for the third and fourth claims, we find his contentions unpersuasive, and as to the third and fourth claim, we hold that any errors were harmless. Accordingly, we affirm.

I
The murder of William Johnson arose as a result of a fight over drug turf. On November 11, 1988, Arnez Olden was selling drugs for appellant in the 1300 block of S Street, N.W., when the decedent protested that this was his area. As their verbal exchange continued, Olden saw appellant put on gloves and shoot three times at the decedent. Curtis Edwards also saw a man with Olden shoot the decedent, and subsequently identified appellant as the shooter from a photo array. After hearing gun shots, another man, Cornelius Scott, saw Olden and appellant run from the scene. Yvonne Young also saw appellant and Olden run, and she saw appellant put a gun in his holster immediately after the shots were fired.[1] Deborah Morse saw the decedent talking with Olden and appellant immediately before the shooting. Among other government witnesses, Vincent Easley claimed that appellant had admitted the next day that he had killed the decedent and had showed him the murder weapon, and that appellant had put the murder weapon under the rear seat of his (Easley's) car.[2]
Appellant presented no evidence in his defense but attempted through cross-examination and closing argument to suggest that Easley had shot the decedent. The jury found appellant guilty of first degree murder and carrying a pistol without a license.

II
In a pre-trial motion to compel a psychiatric examination of Arnez Olden, appellant alleged that Olden had been hospitalized at Saint Elizabeths Hospital on eleven occasions since 1982 and suffers from paranoid schizophrenia. The motion stated that because Olden had released his medical records to the defense, his privacy interest was minimal. Before trial, defense counsel proffered to the trial judge that, based on the medical records, Olden had a history of auditory and visual hallucinations and paranoid delusions, was receiving medication for this condition, and that appellant had retained an expert to examine Olden. Thereafter, the trial judge explored Olden's competency to testify by hearing testimony from Olden on two occasions and by examining his medical records.
The first time Olden testified at the competency hearing he claimed that he was not able to testify at appellant's trial. He explained that he had not received his monthly shot of prolixin to prevent him from hallucinating, and that he had smoked PCP and had been hallucinating "a little" on the day of the shooting. To the government's surprise, Olden claimed that he had not seen appellant on the date of the shooting. He also claimed that "voices" had told him to implicate appellant when he had appeared before the grand jury. Stating that he had a record of "hallucinating schizophrenia," and that his doctor had told him that he was not capable of testifying, Olden informed the judge that all he remembered *1102 was that he was selling cocaine with a man named Mike.[3]
At this point, the trial judge suggested that Olden was experiencing the reality of testifying against appellant, who was sitting in front of him, and did not want to be a snitch. Defense counsel objected that the judge's conclusion was without support in the record, and suggested that "[c]learly, the most likely alternative explanation is that he's incompetent." When the judge confronted Olden with the possibility of being prosecuted for perjury and the suggestion that his hearing voices was "nonsense," Olden denied that it was nonsense, saying it was in his records that he had "been hearing voices ever since 1982 up to 1989."[4]
The second time Olden testified at the competency hearing he recounted a very different story. This occurred when the prosecutor advised the judge the following day that Olden wanted to testify. Olden's counsel repeated his concerns about his client's competency, and the judge recalled Olden to testify. This time Olden claimed that he wanted to change his testimony because he had heard that there was a contract out on him, and that upon seeing other witnesses going to the lawyer's office he thought that they were going to change their testimony, thereby putting him "under the gun." He proceeded to deny having heard voices when he was before the grand jury, or that he had heard them the previous day or was currently hearing them, or had heard them on the date of the shooting (although he admitted that he had tested one of appellant's cocaine rocks about an hour before the shooting, while otherwise claiming that he had not had any PCP since before July 21, 1988, months earlier). He then described how appellant had shot the decedent. On cross-examination Olden said that he had been using PCP and some crack since 1982, and that he had used PCP laced with crack the previous day in order to relax. He maintained that he had been telling the truth to the grand jury and lying the previous day, and that upon hearing the trial judge's reference to a ten year punishment for perjury, he had decided not to take the rap for anyone. He denied that taking medication and PCP affected his memory or perception, and he explained that the only reason he had acted as he had the previous day was because there was a contract out on him.[5] Olden and the trial judge then engaged in an extended colloquy.[6]
When the trial judge inquired whether defense counsel would agree to an immediate forensic screening of Olden by an expert, defense counsel objected, maintaining that an expert's independent examination *1103 was necessary.[7] The trial judge disagreed, noting that he had five inches of medical records on Olden and he was not going to order anything more than a forensic screening. Defense counsel then proffered that the defense expert was of the view that a lay person asking a series of narrative questions would not adequately determine Olden's competency as a witness. The judge concluded, however, that "based on what I have heard and what I have seen," he was "completely confident of [Olden's] competency...." The trial judge decided that a forensic screening was unnecessary because the witness was nothing more than a "run-of-the-mill drug abuser." Observing that trial judges become, to some degree, lay experts in the field of competency as a result of taking guilty pleas, the judge stated that he had experienced no problems in communicating with Olden, that he had examined the medical records, and that he "basically [found] a fellow who has been a long-time PCP abuser."[8]
It is well settled in this jurisdiction that the decision whether or not to order a psychiatric examination of a witness to determine his or her competency is a matter within the trial judge's sound discretion. Collins v. United States, 491 A.2d 480, 484 (D.C.1985), cert. denied, 475 U.S. 1124, 106 S.Ct. 1646, 90 L.Ed.2d 190 (1986); Hilton v. United States, 435 A.2d 383, 387 (D.C.1981); Rogers v. United States, 419 A.2d 977, 980 (D.C.1980); Ledbetter v. United States, 350 A.2d 379, 380 (D.C.1976). Because such an examination has the potential to impinge upon a witness' right to privacy, there is a presumption against ordering one. See, e.g., Hilton, supra, 435 A.2d at 387. The trial judge "must weigh the potential evidentiary advantage of the examination against the dangers of unwarranted invasion of privacy posed by such examination," in order to determine whether or not a psychiatric examination should be ordered. Id. The trial judge's ruling on a witness' competency will not be disturbed unless the record provides "unmistakable evidence that the trial court's impressions are defective." Id. at 388; see also Vereen v. United States, 587 A.2d 456, 457 (D.C.1991); Collins, supra, 491 A.2d at 484.
Consistent with our standard of review, we note first, that the record shows, contrary to appellant's contention, that the trial judge understood the standard that was to be applied in determining whether or not Olden was competent to testify. At the close of the competency hearing, the trial judge recapped the proceedings and found that "we continued with the examination of Mr. Olden on August 22, where-upon he testified and showed no problems whatsoever with respect to memory about his illness and memory about this incident, his perceptions and so on."[9]See Hilton, *1104 supra, 435 A.2d at 387 ("[c]ompetency depends upon witness' capacity to observe, remember, and narrate as well as an understanding of the duty to tell the truth").
Second, this is not a case in which the witness admitted experiencing hallucinations or premonitions while testifying at the competency hearing. See Vereen, supra, 587 A.2d at 458.[10] Short of such "ongoing manifestations," id., the court has not held that a history of psychiatric problems, or even a current diagnosis of mental illness, is sufficient to overcome the presumption against compelling a psychiatric examination of a witness. See Collins, supra, 491 A.2d at 484; Hilton, supra, 435 A.2d at 387.
A rational person may, however, suffer from a mental illness that adversely affects his or her ability to perceive, and under some circumstances it will be important for the trial judge to have the assistance of expert guidance. See Vereen, supra, 587 A.2d at 458.[11] The court has warned that a trial judge may lack the qualities of perception and analysis of one trained in the medical profession for diagnosing and evaluating mental illness. Cf. Hunter v. United States, 548 A.2d 806, 811 (D.C.1988) (mental retardation; withdrawal of guilty plea) (citing United States v. Masthers, 176 U.S.App.D.C. 242, 249 & nn. 49-50, 539 F.2d 721, 728 & nn. 49-50 (1976)). At the same time, the court has acknowledged the relevance of a trial judge's experience in deciding whether or not a witness is able accurately to perceive, recall, and relate purported facts and testify truthfully. See Vereen, supra, 587 A.2d at 457; Hilton, supra, 435 A.2d at 387. Indeed, our decision to entrust the determination of competency to the trial judge's discretion arises from the absence of precise standards to guide the trial judge's weighing of the potential evidentiary advantage against the danger of unwarranted invasion of personal privacy. See Ledbetter, supra, 350 A.2d at 380. Consequently, before this court will reverse a trial judge's determination that a witness is competent to testify, there must be "unmistakable evidence that the trial court's impressions are defective." Hilton, supra, 435 A.2d at 388. We conclude that no such defect exists here.
The trial judge had the benefit of medical records on Olden's mental condition. In other words, the records provided the judge with the benefit of expert medical analysis of Olden's mental condition. The trial judge reviewed the witness' medical records and concluded that, as the medical *1105 records show, Olden's mental condition had been identified as tied to his drug usage.[12] Further, the medical records indicated that Olden was able to ignore the voices he heard when he was indulging in his illegal drug use.
The judge also engaged in a lengthy voir dire of Olden, with generous opportunity for both counsel to examine the witness. On the basis of that voir dire the judge found that Olden was capable of providing a rational explanation of his conduct and of the events relating to the murder. These findings are supported by the record and are not clearly erroneous. The witness did not claim at the time of voir dire that he was experiencing hallucinations, as was the case in Vereen, supra, 587 A.2d at 458. His counsel's information about the views of the witness' case worker was vague at best. Counsel did not state that Olden claimed to be experiencing hallucinations at that time. Further, the medical records suggest that the attempted suicide, see note 3, supra, occurred in 1986.
Accordingly, the question is whether the defense proffered sufficient other evidence to overcome the presumption against compelling an examination of the witness. In addition to the long medical history, there was the unusual conduct of the witness during the first day he testified at the competency hearing. Olden was not only unable at one point to engage in a meaningful colloquy with the trial judge, but he rocked in the witness chair, cursed, referred to his need for his "sack," and was apparently ready to risk a perjury prosecution. Counsel for the witness also advised the judge, before Olden's second appearance as a witness at his competency hearing, of his concerns about his client's competency. There also was the fact that the witness had not received his monthly medication, which was designed to avert hallucinations.
On the other hand, on the second day, the witness engaged in a lengthy colloquy with the trial judge and offered an apparently cogent explanation for his behavior the previous day. See Ledbetter, supra, 350 A.2d at 380. Olden's explanation of his drug use presented the judge with the picture of a man who used drugs from time to time but was apparently able to forego drug use for extended periods. Such abstention was confirmed by the medical records.[13] Further, the witness claimed that he had been in a drug treatment program for five months, since March 19, 1989. He also offered a lucid explanation of what had happened on the date of the shooting, see Collins, supra, 491 A.2d at 485; Hilton, supra, 435 A.2d at 388, and his explanation was corroborated by proffers from the prosecution.
In determining whether an examination of Olden was necessary, the judge properly weighed the potential adversarial advantage to appellant against Olden's privacy interests. See Hilton, supra, 435 A.2d at 387. The judge noted that the defense wanted an expert to examine Olden in order to be in a position "to present expert testimony of any sort to try to detract from the apparently devastating testimony that Mr. Olden is about to present against the defendant." Although the government had other witnesses to the shooting, Olden was its best witness because he alone was present at the scene and knew appellant by name. Even with evidence from the government's other witnesses, the judge could properly conclude that, from the defense perspective, Olden was a critical witness for the government.
*1106 As to Olden's privacy interest,[14]see id. (describing nature of privacy interest as the potential harassment resulting from the examination or the likelihood that the witness may be deterred from coming forward), no suggestion was made that Olden was willing to undergo a psychiatric examination. Indeed, Olden's claim that he was competent and his explanation for his peculiar behavior on the first day of his competency hearing suggest the contrary. See Collins, supra, 491 A.2d at 484 (citing Ledbetter, supra, 350 A.2d at 380).
The "red flag," United States v. Crosby, 149 U.S.App.D.C. 306, 307, 462 F.2d 1201, 1202 (1972), of repeated hospital commitments presented by the defense proffer merited careful consideration by the judge, and it was appropriate for the trial judge to conduct a lengthy examination, by counsel and the court, of the witness on voir dire. Hilton, supra, 435 A.2d at 388. The judge could also properly take into account the fact that the witness had undergone a series of mental commitments and be skeptical, in view of the information in the medical records about the nature of that illness, that further expert evidence would provide additional insight. Cf. Collins, supra, 491 A.2d at 484.
In light of the foregoing circumstances, we conclude that there is no "unmistakable evidence that the trial court's impressions are defective." Hilton, supra, 435 A.2d at 388. The judge's finding, even after only the first day of Olden's testimony, that Olden's conduct was explained by the reality he faced of testifying against appellant, was further buttressed by the second day of testimony and the judge's review of the medical records. After the second day, having reviewed Olden's medical records and having heard his revised testimony over the course of several hours, the judge had reason to conclude that Olden's problems were primarily those of a drug user who generally was able to handle himself day by day, and that he was competent to testify. Collins, supra, 491 A.2d at 484 (absent clear error, cannot change trial court's balancing, citing Ledbetter, supra, 350 A.2d at 380). Olden knew where he was and did not present the incomprehensible type of statements that could have caused the judge to conclude that he did not understand what was going on. See, e.g., Vereen, supra, 587 A.2d at 458.
Despite the fact that aspects of Olden's testimony may not always have been entirely clear, see Hilton, supra, 435 A.2d at 385, the trial judge's impressions of the nature of Olden's problems  both his mental problems and the practical problems facing a man testifying against a drug distributor who had told him to forget what he had seen and had put out a contract on him and the other government witnesses  were supported by the evidence. See Ledbetter, supra, 350 A.2d at 380. Appellant contends that the trial judge's conclusion that Olden was nothing more than a drug abuser was clearly erroneous, but the judge's statement to this effect cannot properly be viewed as suggesting that the judge improperly discounted the fact that Olden had also been diagnosed as suffering from schizophrenia, paranoid type. Were we to find an abuse of discretion by the trial judge in denying appellant's motion to compel a psychiatric examination of Olden, notwithstanding the information in the medical records and the evidence at the extended voir dire of the witness, then the presumption against such an examination would be significantly undermined in today's environment, where illegal drug use is prevalent and testimony offered by either side at a criminal trial will often involve *1107 witnesses who are or have been drug users.
Accordingly, we find on this record no abuse of discretion by the trial judge in denying appellant's motion.

III
Appellant also contends that the trial judge erred in denying his motion to suppress the handguns found at the time of his arrest, eight days after the murder. We disagree with respect to three of the weapons. As to the fourth, we conclude that any error was harmless.
Corporal Robert Simpson of the Prince Georges County (Maryland) Police Department testified that, as he and another uniformed police officer drove into the parking lot of an apartment complex en route to a domestic violence call, he noticed a legally parked car in which the occupants ducked into their seats upon seeing the police vehicle. Officer Simpson observed the car "rock slightly." He parked the police vehicle in front of the other parked car, blocking its egress. He turned on his high intensity headlights and got out of his vehicle with his gun at his side. Appellant then got out of the parked car, made a throwing motion with his hands, and put his hands up in the air. Officer Simpson patted down appellant, and he ordered the rear seat passengers out of the car and patted them down, too. Another officer patted down the man in the driver's seat and found a small caliber firearm in his jacket. The police subsequently found a.38 caliber pistol in the grass and two nine millimeter semi-automatic weapons under the rear seat of the car. Officer Simpson testified that he believed, on the basis of the ducking motions of the occupants of the vehicle and the high incidence of homicides and stolen vehicles in the neighborhood, that the occupants of the car may have been trying to steal the car.
At trial and on appeal, the government contends that appellant lacks standing to object to the admission of the four handguns found at the time of his arrest. In Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court held that passengers in a car had no legitimate expectation of privacy in the glove compartment or under the seat of a car in which they were merely passengers and asserted neither a property nor a possessory interest in the car or the property seized. Id. at 148-49, 99 S.Ct. at 432-33; accord Rawlings v. Kentucky, 448 U.S. 98, 105, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980) (no legitimate expectation of privacy in another's purse where defendant did not seek access to purse and had no right to exclude others from access to purse).[15] At trial, appellant never disputed the evidence of the car's ownership, nor did he offer other evidence regarding his legal expectation of privacy in the car. Accordingly, we hold that appellant lacked standing to object on Fourth Amendment grounds to the admission into evidence of the three guns found in the car at the time of his arrest.
As to the fourth handgun found in the grass after appellant was seen to toss something as he got out of the car, we conclude that appellant has standing to object to the admission of the officer's testimony about this weapon. See Rakas v. Illinois, supra, 439 U.S. at 130, 99 S.Ct. at 423; id. at 150-51, 99 S.Ct. at 434 (Powell, J., concurring) (passenger in a car may object to his own seizure and seek to suppress the fruit of that seizure); see also In re T.T.C., 583 A.2d 986, 990 (D.C.1990). The seizure issue[16] and the issue of whether *1108 the officer had articulable suspicion to seize appellant[17] both raise serious questions that we need not decide, however, because we conclude that the admission of the discarded gun was harmless. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The government's witnesses, in addition to Olden, placed appellant at the scene of the shooting with Olden and with a gun. They also identified appellant as the man who had fired at the decedent. Moreover, the handgun was not the murder weapon, which was in evidence. Under these circumstances, the evidence that appellant was found with a handgun eight days after the murder was harmless beyond a reasonable doubt.

IV
Although appellant lacked standing to contest the admission into evidence of three weapons on Fourth Amendment grounds, he has also posed a challenge on substantive evidentiary grounds. He contends that the trial judge erred by admitting "other crimes" evidence of the four handguns found in and around the car when appellant was arrested eight days after the murder.[18] We agree that the trial judge erred in admitting this portion of Officer Simpson's testimony, but we conclude that once the murder weapon itself was in evidence, the prejudice arising from admission of evidence about the three other handguns was harmless; the evidence showed that the murder weapon was found nearest to Easley, the man who, according to the defense, had killed the decedent.
Prior to trial the prosecutor informed the trial judge of her intention to introduce evidence of the circumstances surrounding the discovery of the murder weapon. Appellant objected, arguing that aside from the murder weapon, evidence about the three other handguns  the .38 caliber handgun that appellant had tossed away upon getting out of the car, the second handgun found under the rear seat, and the handgun found in the driver's possession  had no connection to the murder charges and was inadmissible under Drew v. United States, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964). The trial judge overruled the objection reasoning that although the evidence was prejudicial, the testimony about the three handguns (other than the murder weapon) was not other crimes evidence but "simply a chain in the circumstantial evidence," and relevant evidence that was admissible under Toliver v. United States, 468 A.2d 958 (D.C.1983).
There was no Drew, supra, exception for admitting the three guns (other than the murder weapon).[19] Appellant possessed *1109 a .38 caliber weapon at the time of his arrest eight days after the murder, and was in the company of three other people, each of whom possessed a handgun, including the murder weapon. That appellant was illegally armed when arrested, or that he was in the company of other illegally armed men when he was arrested, was minimally relevant to whether he committed the murder with which he was charged. The circumstances of his arrest did not show motive, intent, identification, a common plan, or absence of mistake or accident, nor illuminate any other relevant issue. Thus, the evidence was inadmissible under Drew. The evidence of the three handguns (other than the murder weapon) had little probative value, which was outweighed by its prejudicial effect.
The government maintains that because appellant claimed that the murder weapon was possessed by someone else in the car  the murder weapon was found under the rear passenger seat where Easley was sitting  appellant placed his intent at issue, and therefore the evidence that there were four men with four handguns in the car was admissible to show appellant's constructive possession of the murder weapon. In other words, the government argues, it was necessary to show that appellant was aware of the presence of the other handguns  the ducking motion observed by the police officer arguably indicated that the four men in the car were trying to hide the four handguns  in order to rebut any claim by appellant that he was simply a passenger in the car and unaware of the presence of the handguns. However, except as it bore on criminal predisposition, appellant's awareness of the presence of the handguns in the car eight days after the murder was of minimal probative value to the charged offenses, but was clearly prejudicial. Had the defense made an effort to distance appellant from the murder weapon, moreover, this would have provided a more appropriate occasion for the judge to reconsider the admissibility of the handguns. See Thompson v. United States, 546 A.2d 414, 424 (D.C.1988) (court should await conclusion of defendant's case, when the judge is in the best position to balance probative value and the government's need against the prejudicial effect).
In addition to the traditional Drew exceptions, see note 19 supra, however, other crimes evidence is "`admissible when relevant to explain the immediate circumstances surrounding the offense charged and when its probative value outweighs its prejudicial effect.'" German, supra note 19, 525 A.2d at 607 (quoting Green v. United States, 440 A.2d 1005, 1007 (D.C.1982)). Evidence of other crimes may also be admissible when the other crimes evidence is "inextricably entwined with the evidence necessary to [prove] ... the crime charged." Lee v. United States, 471 A.2d 683, 686 (D.C.1984); Toliver, supra, 468 A.2d at 961 ("incidental, uncharged criminal conduct inextricably intertwined with evidence of the charged offense" admissible without cautionary Drew instruction). Our standard of review is for abuse of discretion. German, supra note 19, 525 A.2d at 607.
There was no basis for admission of the three guns under Toliver, supra, 468 A.2d 958. The court has held that Toliver evidence is strictly limited in time and place to the criminal conduct with which the defendant is charged. See Holmes, supra note 19, 580 A.2d at 1266; Williams v. United States, 549 A.2d 328, 333 (D.C.1988). The evidence of the circumstances of appellant's arrest eight days after the murder was not "inextricably intertwined with the evidence of the charged offense." Toliver, supra, 468 A.2d at 961. Nor was it necessary to explain the circumstances of appellant's arrest in order to clarify the charges for which he was on trial. The government's suggestion that a Toliver analysis should apply at the time of arrest as well as at the time of the crime has no legal foundation and could impair the effectiveness of Drew, supra, 118 U.S.App.D.C. at 15, 331 F.2d at 89.
*1110 Nevertheless, we conclude that the admission of Officer Simpson's testimony about the handgun discarded by appellant and the two handguns (other than the murder weapon) found in the car was harmless error. See Harper, supra note 19, 582 A.2d at 489; Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). Once the murder weapon was in evidence, the other evidence of handgun possession was, by comparison, less prejudicial, particularly in view of the government's evidence of appellant's role in the shooting. Significantly, the admission of evidence that the murder weapon was found nearest to Easley was consistent with appellant's theory that Easley had shot the decedent. Appellant's possession of a different handgun thereby strengthened the suggestion that the murder weapon was not his. Thus, given the overall strength of the government's case, we can say with "fair assurance" that this error did not substantially influence the jury's determination. Kotteakos, supra, 328 U.S. at 765, 66 S.Ct. at 1248.

V
Finally, appellant contends that the trial judge erred by denying defense requests to instruct the jury on the limited use of prior consistent statements testimony, perjurer's testimony, and accomplice testimony.[20]
Appellant maintains that he was prejudiced by the absence of Criminal Jury Instruction 1.06 (prior consistent statements) to guide the jury in its evaluation of Olden's testimony because Olden's prior consistent statements to the grand jury, during his competency hearing, and to the prosecutor implicating appellant in the murder reinforced the credibility of the government's other witnesses. The government concedes, and we agree, that the judge erred by not instructing the jury on prior consistent statements. The government maintains, nevertheless, that any error was harmless, citing Lucas v. United States, 436 A.2d 1282 (D.C.1981) (applying Kotteakos, supra, 328 U.S. at 765, 66 S.Ct. at 1248, standard to failure to give instruction). Olden's testimony that his prior consistent statements represented the truth about who killed the decedent complicates the issue. But the defense objection to the prosecutor's reference during closing argument to Olden's grand jury testimony was sustained, and in view of the government's other evidence of appellant's guilt, we agree that any error was harmless.[21]
The trial judge did not give a limiting instruction to the jury on either Olden's prior consistent or prior inconsistent statements. Thus, the defense obtained the benefit of having Olden's prior inconsistent statements considered by the jury as substantive evidence. Furthermore, Olden was impeached with his prior inconsistent *1111 statements as well as his medical history, drug abuse and prior convictions. Most importantly, the strength of the government's evidence of appellant's guilt  as a result of the interlocking corroborative testimony of the government's other witnesses, Cornelius Scott, Yvonne Young, and Deborah Morse  provided substantial corroboration of Olden's testimony. Accordingly, we are satisfied that the judge's failure to instruct on Olden's prior consistent statements could not have substantially affected the jury.
Similarly, the trial judge's refusal to give a perjurer's testimony instruction, if error, was not reversible error.[22] There was an evidentiary basis for the instruction, and the evidence of Olden's perjury can be viewed as directly supporting appellant's claim that there was a conspiracy to pin the murder on him. But we find no prejudice to appellant. This is not a situation in which the trial judge failed to instruct on the defense theory of the case. See Graves v. United States, 554 A.2d 1145, 1147 (D.C.1989). Rather, appellant contends he was prejudiced by the absence of the instruction because "Olden's perjury went to the heart of his credibility." However, the circumstances surrounding Olden's perjury were fully presented to the jury, and the judge instructed the jury on assessing the credibility of witnesses.[23] The nature of the perjury was not subtle, as the defense made certain the jury was aware through cross-examination. Under these circumstances, upon viewing the instructions as a whole, Powell v. United States, 485 A.2d 596, 601 (D.C.1984), cert. denied, 474 U.S. 981, 106 S.Ct. 420, 88 L.Ed.2d 339 (1985), we are satisfied that the instructions provided adequate guidance for the jury to evaluate Olden's testimony without the specific perjury instruction, and hence, that no reversible error occurred. United States v. Bowman, 197 U.S.App.D.C. 246, 254, 609 F.2d 12, 20 (1979).
The failure of the trial judge to give the perjurer's testimony instruction was not error because the instructions sufficiently apprised the jury regarding issues of credibility. See id., 197 U.S.App.D.C. at 254, 609 F.2d at 20. Although the arguments of counsel are not the equivalent of an instruction on the law by the court, it is of some note that defense counsel focused the jury's attention during cross-examination and closing argument, respectively, on the need to consider Olden's testimony carefully because he had previously lied in court, and to the police, and because he had a motive to lie in order to protect someone else with whom he had a relationship. The judge instructed the jury on bias and the interest of a witness. Therefore, viewed as a whole, see Powell, supra, 485 A.2d at 601, the instructions were not deficient. See Bowman, supra, 197 U.S.App.D.C. at 254, 609 F.2d at 20.
Finally, appellant's contention that the trial judge erred by denying the defense request for the accomplice instruction is meritless. "An accomplice is anyone who knowingly and voluntarily cooperates with, aids, assists, advises, or encourages another person in the commission of a crime, regardless of his degree of participation." CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.22. Although there was evidence that Olden witnessed the shooting and left with appellant after the shooting, there was no showing that Olden "knowingly and voluntarily cooperate[d] with, aid[ed], assist[ed], advise[d], *1112 or encourage[d] [appellant's] ... commission of a crime." Id.; cf. Bailey v. United States, 135 U.S.App.D.C. 95, 98-99, 416 F.2d 1110, 1113-14 (1969) (presence, slight prior association, and subsequent flight with principal insufficient basis for aiding and abetting conviction; no evidence that presence designedly encouraged or facilitated principal). At most, there was evidence from Olden that he had accepted a bribe of cocaine from appellant after the shooting and had been told by appellant not to talk. This was not sufficient to require the judge to give the accomplice instruction. Cf. Sherer v. United States, 470 A.2d 732, 741 (D.C.1983) (perjurer's instruction not required where judge gave accomplice instruction when witness admitted he had lied to grand jury), cert. denied, 469 U.S. 931, 105 S.Ct. 325, 83 L.Ed.2d 262 (1984).
Accordingly, we affirm the judgment of conviction.
NOTES
[1] Young admitted that she was a drug abuser and had consumed two or three rocks of cocaine on the day of the shooting. She also testified that the police had searched her home on several occasions in search of illegal drugs.
[2] Easley was impeached with several criminal convictions. Stephen Faison and Maurice Watkins also testified for the government: Faison saw Olden at the scene of the shooting with another man who had a gun; Watkins saw the shooter but blacked out and could not identify him.
[3] When Olden announced that he was leaving to get his "sack," cursed, and left the witness stand, the judge ordered him detained and appointed counsel. Thereafter, counsel for Olden advised the trial judge that Olden had said that he was hearing voices telling him to commit certain acts, such as suicide, that Olden's case manager at the Spring Road Mental Health Center had expressed concern about Olden's ability to testify, but that Olden had indicated that he understood his Fifth Amendment rights, although counsel had doubts about whether he understood the consequences.
[4] The prosecutor indicated that she had no intention of calling Olden as a witness at that time, explaining that she intended to pursue perjury charges against him. Over defense objecting, the judge found after hearing Olden testify for the first time that Olden was lying to protect appellant. The judge also declined to preclude the government from calling Olden as a witness.
[5] Olden explained that although he had heard about a contract two weeks earlier, it was not until the previous Saturday that he had learned that there was a contract out on him and everyone else. Olden claimed that right after the shooting appellant had told him not to say anything and had given him six rocks of cocaine.
[6] In addition to recounting his medical history, Olden assured the judge that he was competent. In response to a series of questions by the trial judge, Olden related that he knew the names of his brothers and sisters, his parents' birthdays, and his age (32). He stated that he had attained a sixth grade education (although he did not drop out of school until 10th grade). Olden also did simple math, and named the current and two prior presidents. He said that he thought that his biggest problem was "messing with drugs." In addition, he explained how he had acquired his habit of rocking in his chair. The judge noted that Olden was not rocking the second time he testified.
[7] Defense counsel argued:

Generally people with schizophrenia can get up on the stand and answer narrative questions because those narrative questions deal with something that in a psychological jargon is called fund of knowledge. Generally schizophrenics don't have any problems with their fund of knowledge. What they do have problems with are their ability to remember events correctly, their ability to narrate those events, and their ability to distinguish between what is truth and what is fantasy.
Mr. Olden could very well think that he is telling the truth, but in fact is not, and the only way to determine whether these features are operative with him at the time is a complete independent psychiatric examination.
[8] The judge stated:

[Olden] may go in and out of reality from time to time, but it's almost always precipitated by PCP abuse. Drug abusing witnesses are nothing new to this calendar.
* * * * * *
I am totally confident of Mr. Olden's competency to testify as a witness. Indeed, he's a very disarmingly competent witness. He's very frank, very much of a street-wise individual, apparently was dramatically impressed by the cold-blooded killing of a seventeen year old that he had known for years by this defendant. Not inappropriately scared to death of him and of his friends, and has heard about phone calls from Lorton where the defendant has been from time to time, about a contract on him and a contract on others if people snitch on [appellant].
It was  he was a very convincing witness.
[9] During the competency hearing the judge stated:

And so I guess the question in mind is whether you've had so much PCP in your lifetime or so much Prolixin or so much cocaine or a mixture of all of them for me to make a conclusion that I can't let this guy testify before a jury because he can't remember the time of day or is crazy or what have you.
The judge explained that he had to determine whether or not Olden "can answer questions and know what the questions are on the witness stand and answer yes or no and understand the truth."
Some remarks by the judge, on which appellant relies, do not state the proper standard, but viewed in context were expressions of frustration with delays in the proceedings rather than abandonment of a proper understanding of the correct legal standard for determining competency.
[10] In Vereen, supra, the court stated:

Recognizing that the witness appeared outwardly rational the remaining concern was whether the "vapors" and premonitions had any substantial latent effect on the witness' contact with reality not readily observable. On this point it would seem that any insight which a person with training and experience in this area could offer would be useful.
Such opinions need not be definitive, but where there are ongoing manifestations of mental illness, they may well assist the judge in assessing whether the witness can distinguish the real from the imagined.
Id. (emphasis added).
[11] In Vereen, supra, 587 A.2d at 458, the court stated, regarding an apparently rational witness, who responded normally to questions during voir dire proceedings, but who had a history of schizophrenia and was experiencing hallucinations on the day of the voir dire hearing, that:

Without the benefit of an expert's evaluation at the voir dire stage, the trial judge was ill-equipped to determine whether the [hallucinations], premonitions, and any other irregularities were harmless aberrations or might, in some way, bear on her perception, recollection, or ability to distinguish fact from unreality.
Id. Therefore, the court held that in the unusual circumstances of that case "where the witness [is] currently experiencing mental irregularities," the trial judge erred in not ordering a psychiatric examination to aid in determining the witness' competency to testify. Id.
[12] Olden had been brought to Saint Elizabeths Hospital on April 27, 1986, for the tenth time. At that time, barbiturates and other illegal substances were found in his body. In April 1987, he was released from the hospital as an outpatient. Progress notes in 1989 state that Olden's insight was good, his judgment was fair to good, and his memory was good for recent and remote events. The general description of Olden that emerges from the medical records is that of a drug abuser who did not always cooperate with treatment plans and could benefit from additional treatment. This, however, did not stop the hospital from releasing him as an out-patient.
[13] The medical records indicate that as of January 22, 1986, Olden had "been able to stay sober for 3 months and had not used any drugs."
[14] Although Olden had released his medical records to the defense, his reason for doing so was directly tied to his effort to avoid testifying because of fear of appellant who, Olden knew, had put out contracts on certain witnesses. The judge found that Olden had given appellant his medical records with the idea that if he did he would not have to testify. During a colloquy with the trial judge during his second appearance at the competency hearing, Olden explained that by giving his medical records to the defense, he thought appellant would be able to show that he was insane and then he would not have to testify. Under these circumstances we conclude that the judge could reasonably conclude that Olden's surrender of his records did not remove the presumption against ordering a competency examination of a witness. Hilton, supra, 435 A.2d at 387.
[15] See Austin v. United States, 433 A.2d 1081, 1084 (D.C.1981) (passenger has no privacy interest in car or briefcase); see also United States v. Booth, 455 A.2d 1351, 1353 (D.C.1983) (defendant had standing as a result of his authority to deny entry to portion of rooming house); State v. Cowen, 104 Idaho 649, 662 P.2d 230 (1983) (passenger has no standing, search and seizure of third-party's vehicle).
[16] See California v. Hodari D., ___ U.S. ___, 111 S.Ct. 1547, 1550, 113 L.Ed.2d 690 (1991); Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). The trial judge ruled that the passengers in the car were seized when Officer Simpson positioned his police vehicle so that the parked car could not move and shined his high-intensity lights at the car. See United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); see also Commonwealth v. Greber, 478 Pa. 63, 385 A.2d 1313 (1978) (blocking automobile, a seizure); cf. State v. Epperson, 237 Kan. 707, 703 P.2d 761 (1985); Garza v. State, 771 S.W.2d 549 (Tex.Cr.App.1989). Appellant's conduct upon exiting the car  throwing the handgun and putting his hands in the air  was a submission to the police show of authority. See Hodari D., supra, 111 S.Ct. at 1550.
[17] See Jones v. United States, 391 A.2d 1188, 1188-89 (D.C.1978) (no articulable suspicion to justify ordering driver and passenger out of legally parked car, at one a.m. in an area of recent robberies, where the passenger attempted to hide something as a police officer approached); Hemsley v. United States, 547 A.2d 132, 134 (D.C.1988) (same; three persons in smoked filled car in high narcotics area and attempt to leave); see also Duhart v. United States, 589 A.2d 895, 898-99 (D.C.1991) (same; defendant put object in pocket as police approached); Smith v. United States, 558 A.2d 312, 316 (D.C.1989) (same; presence in high crime area and prior conversation with persons observed in drug transaction); Curtis v. United States, 349 A.2d 469, 472 (D.C.1975) (same; furtive gesture upon announcement that police were approaching); United States v. Page, 298 A.2d 233, 236-37 (D.C.1972) (furtive gesture too ambiguous); Commonwealth v. Bacon, 381 Mass. 642, 411 N.E.2d 772, 775 (1980).
[18] The car was stopped in Maryland and, as in the District of Columbia, it is a crime to carry an unlicensed handgun in Maryland. See MD. ANN.CODE art. 27, § 36B (b) (1987 Repl. & Supp. 1991).
[19] Evidence of other crimes is inadmissible to show criminal predisposition. Drew, supra, 118 U.S.App.D.C. at 15, 331 F.2d at 89. Generally, unless the other crimes evidence is admitted to show motive, intent, identification, a common scheme or plan, or absence of mistake or accident, it may not be admitted. German v. United States, 525 A.2d 596, 607 (D.C.1987); Jones v. United States, 477 A.2d 231, 237 (D.C.1984); see Holmes v. United States, 580 A.2d 1259, 1267 (D.C.1990) (Drew exceptions illustrative rather than exclusive). Additionally, the trial court must exclude other crimes evidence if its probative value is outweighed by the prejudicial impact on the defendant. Harper v. United States, 582 A.2d 485, 488 (D.C.1990).
[20] Appellant's contention that the trial judge erred by admitting into evidence Olden's prior consistent statements, to wit: his testimony before the grand jury and his statements to the prosecutor that he saw appellant shoot the decedent, to which no objection was made by the defense at trial, is meritless. Prior consistent statements are inadmissible except to meet the force of impeachment and to rebut a charge of recent fabrication. Reed v. United States, 452 A.2d 1173, 1180 (D.C.1987), cert. denied, 464 U.S. 839, 104 S.Ct. 132, 78 L.Ed.2d 127 (1983); see also Mitchell v. United States, 569 A.2d 177, 184-85 (D.C.) (prior statements admissible to rehabilitate witness), cert. denied, ___ U.S. ___, 111 S.Ct. 521, 112 L.Ed.2d 532 (1990); Coltrane v. United States, 135 U.S.App.D.C. 295, 303, 418 F.2d 1131, 1140 (1969) (same). Because Olden was impeached at trial with portions of his statements to police, his prior consistent statements were admissible because they contained "relevant information that could be used to meet the force of the impeachment." Reed, supra, 452 A.2d at 1180. The prior consistent statements to the grand jury and the prosecutor were admissible to rebut any charge of recent fabrication. See id.
[21] Appellant's reliance on Reed, supra, 452 A.2d at 1181, for the proposition that appellant was prejudiced by the trial judge's error, is misplaced. There was ample evidence, apart from Olden's prior consistent statements, to enable the jury reasonably to find him a credible witness, and the jury could reasonably find that Olden offered a lucid and believable explanation of his prior inconsistent statements, and a lucid and believable explanation of what occurred on the date of the shooting that was corroborated by other evidence.
[22] CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.24 provides: "The testimony of an admitted or convicted perjurer should be received with caution and scrutinized with care."
[23] The judge instructed the jury that, in determining the credibility of the witness, it may consider:

whether the witness impressed you as a truthful individual, ... having an accurate memory and recollection, whether the witness had any motive for not telling the truth, whether the witness had a full opportunity to observe or hear the matters concerning which he or she testifies.
Whether the witness has any interest in the outcome of th[e] case or friendship toward or dislike of other persons concerned with the case.
See CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.11 (3d ed. 1978).