Byron R. **DORSEY**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 02–CF–1276.

District of Columbia Court of Appeals.

Argued Nov. 29, 2005.

Decided Aug. 30, 2007.

Christopher Griffiths, with whom Douglas J. Wood was on the brief, Riverdale, MD, for appellant.

Edith Shine, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time of argument, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Roy W. McLeese III and Kami Chavis Simmons, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, and GLICKMAN and KRAMER, Associate Judges.

GLICKMAN, Associate Judge:

Convicted after a jury trial of voluntary manslaughter while armed and related weapons offenses, appellant Byron R. Dorsey asserts that the trial court committed reversible error in several of its rulings. We disagree and affirm appellant's convictions.

Appellant was charged with killing Andre Wilson inside his home at 1333 Congress Street, S.E. The prosecution presented evidence that appellant and his brother, Christopher Herron, went to that residence in order to sell marijuana to some of its other occupants. After their arrival, Wilson confronted them and ordered them to leave. A scuffle ensued, during which appellant fired the shots that killed Wilson.

Appellant did not testify at trial. The primary theme of his defense was misidentification: his counsel challenged the prosecution witnesses and denied that appellant was at the scene of the shooting. At the conclusion of the trial, however, appellant requested jury instructions on self-defense and defense of a third party, based on evidence adduced in the prosecution case that Wilson was the aggressor.

■ 1. *Denial of Instructions on Self–Defense and Defense of a Third Person.* Appellant argues that the trial court erred by refusing to instruct the jury on self-defense and defense of a third person. We are not persuaded. While a defendant is entitled to an instruction on a theory of defense so long as there is some evidence ("however weak") to support it, *see, e.g., Hernandez v. United States,* 853 A.2d 202, 205 (D.C.2004),[1] instructions on self-defense and defense of a third person should not be given if the defendant, as a matter of law, used excessive force. *See, e.g., Edwards v. United States,* 721 A.2d 938, 941 (D.C.1998); *Fersner v. United States,* 482 A.2d 387, 392–93 (D.C.1984). To justify the use of lethal force, as in this case, there must be evidence that the defendant honestly and reasonably believed that he or a third party was in imminent peril of death or of serious bodily injury, and that the use of lethal force was necessary to save himself or the third party from that harm. *Edwards, supra; Fersner,* 482 A.2d at 392; *see also Fisher v. United States,* 779 A.2d 348, 355 (D.C.2001). "[N]ever must the necessity be greater than when the force employed defensively is deadly." *Edwards, supra* (quoting *Harper v. United States,* 608 A.2d 152, 154 (D.C.1992)). *Cf. Fersner,* 482 A.2d at 393 ("[T]here are ... degrees of deadly force. On some occasions, it may be reasonable only to cause serious bodily harm not threatening life itself.").

■ Viewed in the light most favorable to appellant, the testimony established that Andre Wilson was the initial aggressor and that appellant responded with lethal force. When Herron and appellant did not instantly obey his order to leave the house, Wilson grabbed Herron, stating "what you ain't understand me? what, you ain't hear me? y'all got to go." Appellant said they were ready to go and headed for the door, but Wilson continued to grab Herron by his shirt and hold him, preventing him from leaving. Wilson, who him-

1. We view the evidence in the light most favorable to the defendant. *Hernandez,* 853 A.2d at 205. Evidence may be sufficient to require a self-defense or third-person defense instruction whether it was presented by the defense or the prosecution and even if the defendant did not testify to it. *Id.* Further-more, the fact that the defendant has presented a different or even an inconsistent defense is not a basis on which to deny a self-defense or third-person defense instruction that has adequate support in the evidence. *See McClam v. United States,* 775 A.2d 1100, 1104 (D.C.2001).

self was unarmed, observed that Herron had a handgun and the two men wrestled for control of it; at least one witness saw Wilson get his hands on the gun.[2] Witnesses described both Herron and appellant as appearing scared. Appellant pulled out his gun—possibly after Wilson told his friend Bobby Capies to check if appellant was armed—and warned Wilson to let go of his brother, but Wilson ignored the warning. Capies, who also was unarmed, smacked appellant's hand, apparently trying to knock the gun away. Appellant maintained control of the gun, however. He fell back or withdrew into the corner of the room, and then opened fire, shooting both Capies and Wilson. According to the autopsy report, Wilson sustained a total of eight bullet wounds, which caused his death.

Appellant argues that in this "rapidly evolving situation," he "could have reasonably believed that his life and the life of his brother [were] in imminent danger. Wilson had his hand on [appellant's] brother's gun, and was ignoring [appellant's] pleas to let go. When Capies lunged at him, [appellant] could have reasonably ... believed that he was about to be overpowered, and that he and his brother would be shot by Wilson." Thus, appellant concludes, there was "at least some evidence" sufficient to entitle him to instructions on self-defense and defense of a third person. *Id.*

We are persuaded, however, as a matter of law, that the situation confronting appellant was not dire enough to justify his killing Wilson. Wilson was not armed; he had uttered no threats; he did not obtain control of Herron's weapon or point it at Herron or appellant; and he had not inflicted any serious injury on Herron.[3] The same can be said of Capies with respect to his interaction with appellant. The evidence therefore did not show that appellant or his brother were in imminent peril of death or serious bodily harm, such that appellant reasonably could think a lethal response necessary,[4] even though Wilson was the initial aggressor and he was struggling to disarm Herron.

In coming to that judgment, we find *Fersner* especially instructive. In that case, the defendant Fersner struck the decedent Winslow in the head with a hatchet in order to save a third person, Reed, from a vicious beating. We acknowledged that Fersner reasonably believed that Reed was in imminent danger of serious bodily harm from Winslow, who was kicking and stomping her and threatening to break her neck. Nonetheless, we upheld the trial court's refusal to give an instruction on the use of deadly force in defense of a third person, because Fersner "did not have 'reasonable grounds to believe'—even if acting 'in the heat of passion'—that hatchet blows to Winslow's head were necessary to defend Reed." 482 A.2d at 393. We explained that

> [e]ven if appellant [Fersner] was entitled to use deadly force—*i.e.*, force "likely to cause death or serious bodily harm"— there are, as this definition implies, de-

---

2. Wilson reportedly was upset that Herron had brought a "joint" into a house where there were children, asked what Herron was "reaching for," and expressed fear that Herron was going to shoot him.

3. Herron did sustain a gunshot wound, but it was apparently from appellant's weapon; there is no evidence that it was inflicted by Wilson or anyone else.

4. Because appellant did not testify, there also is no direct evidence in the record as to what he honestly believed. It matters not, however, whether appellant honestly believed in the need to use deadly force, if his use of deadly force was objectively unreasonable.

grees of deadly force. On some occasions, it may be reasonable only to cause serious bodily harm not threatening life itself. This is such a case. Under the circumstances here, appellant obviously could have saved Reed by striking Winslow with the blunt side of the hatchet elsewhere on the body, with less damaging (here fatal) results. As a matter of law, therefore, appellant used excessive force; it was not necessary for appellant to use an amount of deadly force that was likely to kill Winslow.

*Id.* *Fersner* teaches that a defender may not use force "likely to kill" unless it is reasonable for him to think that such lethal force is truly necessary. That is a high standard, which reflects the sanctity of life. It is a standard that appellant did not meet. He had less drastic options after Capies failed to dislodge the gun from his hand; he did not have to shoot to kill. "As a matter of law, therefore, appellant used excessive force," *id.*, and we hold that he was not entitled to instructions on self-defense or defense of a third person.

2. *Denial of Mistrial After Jury Was Informed of Appellant's Prior Convictions.* Appellant argues that the trial court abused its discretion, *see Martin v. United States,* 606 A.2d 120, 132 (D.C. 1991), in failing to grant a mistrial after the jury was told, through the reading of the indictment and the prosecutor's opening statement, that appellant previously had been convicted of a felony crime of violence or a dangerous crime. The references to appellant's prior convictions were made on the premise that the convictions needed to be proved to the jury for purposes of sentence enhancement. However, as the trial court and the prosecutor eventually recognized, that premise was mistaken. *See Harris v. United States,* 536 U.S. 545, 557–58, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002); *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The references were not necessary, they served no legitimate purpose, and they could have been unfairly prejudicial to appellant by improperly tending to suggest his disposition to commit a violent crime. *See, e.g., Thompson v. United States,* 546 A.2d 414, 418 (D.C. 1988); *Drew v. United States,* 118 U.S.App.D.C. 11, 15, 331 F.2d 85, 89 (1964).

■ Improper references to a defendant's past criminal conduct do not necessarily require the court to grant a mistrial, however. *See, e.g., Goins v. United States,* 617 A.2d 956, 959 (D.C.1992). The issue before us turns on our assessment of the potential prejudice to appellant, taking into account the gravity of the misconduct, the strength of the government's case, the centrality of the issue affected, and the corrective measures taken by the trial court to mitigate the prejudice. *See Coleman v. United States,* 779 A.2d 297, 302 (D.C. 2001).

■ The relevant factors persuade us that the court did not err in denying a mistrial in the circumstances of this case. Unlike in other cases that have posed similar issues, no actual evidence of appellant's prior convictions was presented in this case. The references to those convictions appeared only in the court's reading of the indictment and the prosecutor's opening statement. Those references were brief, non-specific, and not linked to the central issue at trial, which was appellant's identification as the perpetrator. The government's proof of appellant's identification was strong and unrefuted. And the trial court instructed the jury that the mention of appellant's prior convictions in the indictment was not evidence; that the jury had heard no evidence of any prior convictions; that the jury was to decide the case solely on the evidence and the court's in-

structions; and, finally, that "[s]ince there has been no evidence on the issue, I instruct you that you are not to speculate on this issue and that you should disregard my previous statement about this issue." It would have been better had the court given such a curative instruction immediately after the jury was told that appellant had prior convictions, rather than at the close of trial. *See Coleman*, 779 A.2d at 304–06. Nonetheless, the instruction given was clear and emphatic, and in view of the other factors we have mentioned, we are not persuaded that it was insufficient or ineffective to mitigate the prejudice to appellant. *See id.* at 303 (noting the usual assumption that jurors can be counted upon to follow corrective instructions); *see, e.g., Harris v. United States*, 602 A.2d 154, 165 (D.C.1992) (en banc). We therefore conclude that the court did not err in denying appellant's request for a mistrial.

3. *Determination of Witness's Competency Without an Independent Medical Examination.* Upon reviewing the medical records of prosecution witness Arlisa Carter, who had been diagnosed with paranoid schizophrenia, and recently hospitalized for psychiatric problems, appellant moved to exclude her as a witness unless an independent medical examination (IME) established her competency. A competency hearing was held, at which Carter testified, but the court denied appellant's request for an IME and permitted the witness to testify. Appellant argues that the court erred in finding Carter competent without an IME. We do not agree.

■■■ "In assessing the competency of a witness, a trial judge must evaluate the [witness's] ability to accurately perceive, recall, and relate purported facts, as well as testify truthfully. A trial judge has broad discretion, and a ruling in this regard should not be disturbed unless plainly deficient." *Vereen v. United States*, 587 A.2d 456, 457 (D.C.1991) (citations omitted). "[B]efore this court will reverse a trial judge's determination that a witness is competent to testify, there must be 'unmistakable evidence that the trial court's impressions are defective.'" *Mitchell v. United States*, 609 A.2d 1099, 1104 (D.C. 1992) (quoting *Hilton v. United States*, 435 A.2d 383, 388 (D.C.1981)).

■■■ Whether to order an IME to assist the court in determining a witness's competency to testify is likewise "a matter within the trial judge's sound discretion." *Mitchell*, 609 A.2d at 1103. There is a "strong presumption" against ordering an IME, because of the invasion of privacy and the potential for harassment that it entails. *Barrera v. United States*, 599 A.2d 1119, 1126 (D.C.1991). In the absence of "ongoing manifestations" of hallucinations or other comparably serious present mental irregularities, a history of psychiatric problems and a current diagnosis of mental illness do not suffice to overcome the presumption against compelling an IME. *Mitchell*, 609 A.2d at 1104 (quoting *Vereen*, 587 A.2d at 458). We normally have confidence in the trial court's ability to assess a witness's competency after a hearing without an IME, particularly where the trial court is able to examine the witness's medical records as well as hear from the witness directly. *Mitchell, supra.* In the instant case, Carter was examined under oath; she did not exhibit distorted perceptions, incoherence or the like; and the trial court (and the parties) had her hospital records. We are satisfied that the court was capable of assessing Carter's competency without compelling her to undergo an IME.

■■■ The trial court's impressions of Carter—that she was obstreperous and hostile, particularly toward the defense, but nonetheless competent—seem to us

accurate, not defective. As noted, Carter did not display the kinds of mental impairments that would suggest testimonial incapacity. To be sure, she provided ammunition for challenging her ability to recall and to tell the truth; for example, she often claimed that her memory was gone and at one point asserted that she did not know if she was lying or not. Those responses, however, evidenced Carter's plain unwillingness to cooperate with defense counsel rather than a lack of competency on her part; certainly, the trial court could so conclude. Competency "concerns certain basic, prerequisite capabilities necessary to give testimony," and thus is not to be confused with witness credibility or cooperativeness. *Vereen*, 587 A.2d at 458. Overall, Carter demonstrated an understanding of what it means to testify truthfully; she was oriented in time and place; she understood the functions of judge and jury, and (ultimately) she complied with directions and courtroom procedure. Although Carter's memory was imperfect, her testimony at trial was responsive and her account of the events at issue was coherent and consistent with the recollections of the other witnesses. Her identification of appellant was corroborated by other evidence. Given the absence of manifest impairments and the witness's demonstrated ability to perceive, recall and relate facts, we hold that the court did not abuse its broad discretion in finding Carter competent to testify.

■ 4. *Admission of Appellant's Rap Lyrics.* Appellant asserts that the trial court abused its discretion by admitting his handwritten rap lyrics, which seemingly implicated their author in drug dealing.

Although the lyrics were probative of appellant's identity as the shooter,[5] *see Drew*, 118 U.S.App.D.C. at 16, 331 F.2d at 90, appellant argues that they were substantially more prejudicial than probative. *See Johnson v. United States*, 683 A.2d 1087, 1099–1100 (D.C.1996) (en banc). We disagree with that assessment, if only because the lyrics were far from the only evidence that appellant was a drug dealer. In particular, Arlisa Carter testified that appellant had sold marijuana to her and her friends on the night of the shooting, and one of those friends, Kenneth Douglas, testified that appellant (whom he knew as "B") had been his supplier of marijuana for over a year.

Appellant's convictions are hereby affirmed.

---

5. Prosecution witnesses said that the man who shot Wilson was called "B," arrived on the scene in a burgundy four-door car, and sold marijuana. The rap lyrics indicated that appellant, their putative author, identified himself as "B," drove an Oldsmobile, and dealt drugs. Other evidence corroborated those inferences and established that appellant had driven a burgundy Oldsmobile (which he repainted shortly after the shooting).